# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FRANK ROMANS,

    *Plaintiff,*

v.

ORANGE PELICAN, LLC,

    *Defendant.*

No. 22 CV 4169

Judge Lindsay C. Jenkins

#### MEMORANDUM OPINION AND ORDER

On April 7, 2021, and May 25, 2021, Plaintiff Frank Romans loaned $2 million and $1.5 million, respectively, to Defendant Orange Pelican, LLC ("Orange Pelican"), a commercial enterprise owned and operated by Dr. Arvind Ahuja, its sole member. The terms of those loans were memorialized in two promissory notes. Each note required Defendant to repay the principal and accrued interest one year after execution. Defendant failed to do so, and Plaintiff commenced this breach-of-contract action to enforce the notes.[1]

Although Defendant does not dispute that it failed to satisfy the terms of both notes, it asserts three affirmative defenses, two on the merits and one challenging jurisdiction. With respect to jurisdiction, Defendant argues that this Court lacks

---

[1] The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff is domiciled in Illinois. [Dkt. No. 1, ¶ 4]. Dr. Ahuja, Defendant's sole member, is domiciled in Wisconsin. [*Id.* at ¶ 5]; [Dkt. No. 33, ¶ 5]. Therefore, Plaintiff is a citizen of Illinois, Defendant is a citizen of Wisconsin, and diversity is complete. *W. Louisville Gas & Elec. Co.*, 951 F.3d 827, 829 (7th Cir. 2020). The amount in controversy is $3,770,000, well in excess of the jurisdictional minimum. [Dkt. No. 1, ¶¶ 17, 27].

personal jurisdiction and, therefore, cannot enter judgment against it. On the merits, Defendant argues that its obligation to repay each note was discharged under the related doctrines of commercial impracticability and frustration of purpose.

Before the Court is Plaintiff's motion to strike each of those defenses under Federal Rule of Civil Procedure 12(f) as well as his motion for judgment on the pleadings under Rule 12(c). [Dkt. No. 34]. For the reasons that follow, Plaintiff's motion to strike is granted with respect to Defendant's personal jurisdiction and commercial impracticability defenses but is denied as to Defendant's frustration of purpose defense.[2] Defendant will no doubt struggle to mount such a defense, but— at this early juncture—the Court is not satisfied that it is foreclosed from *trying* to do so as a matter of law.

Plaintiff's failure to prevail on this issue disposes of his motion for judgment on the pleadings as well. Because the door remains open (however slightly) to a frustration of purpose defense, it is not "'beyond doubt'" that Defendant will fail to "'prove facts sufficient to support'" that defense, if given an opportunity to conduct discovery. *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020) (quoting *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020)). Accordingly, Plaintiff's motion for judgment on the pleadings is denied, and this case will proceed to discovery on Defendant's sole remaining defense.

---

[2] As the Court will discuss in greater detail below, the parties' briefs also discuss the potential applicability of the defense of impossibility. Although the Court does not believe that Defendant's answer can be fairly construed to assert such a defense, this opinion will— in light of the parties' briefing and the possibility of amendment under Rule 15(a)(2)—explain why such a defense would also fail as a matter of law.

## I.    Background

Because this case is before the Court on a motion for judgment on the pleadings, the scope of its review is limited to facts contained in those pleadings. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The pleadings in this case consist of Plaintiff's complaint—including the promissory notes attached to the complaint as exhibits[3]—and Defendant's answer. [Dkt. Nos. 1, 31-1, 31-2, 33]. The Court will not consider any factual information adduced by either party outside of those documents. Were the Court to consider such evidence, Federal Rule of Civil Procedure 12(d) would require it to convert Plaintiff's motion into a motion for summary judgment, a step neither party has requested and one that the Court is not inclined to take.

So limited, the facts bearing on Plaintiff's motions are straightforward. On April 7, 2021, Plaintiff loaned Orange Pelican $2 million. [Dkt. No. 1, ¶ 10]. The terms of that loan were memorialized in a promissory note ("the April note"). [*Id.* at ¶ 11]; [Dkt. No. 31-1]. Pursuant to the April note, Orange Pelican agreed to pay back the principal—with interest—on April 7, 2022. [Dkt. No. 31-1, 1]. The loan bore interest "at the per annum rate equal to fifteen percent (15%), computed based on a year of 360 days and the actual number of days elapsed." [*Id.*]. Interest was "due and payable on a quarterly basis, measured in three . . . month increments" from the execution date. [*Id.*].

---

[3]    Although Plaintiff initially failed to attach the notes to his complaint, Judge Aspen granted his motion to incorporate them into the complaint on December 1, 2022, more than a week before Defendant filed its answer. [Dkt. Nos. 31–33]. Under these circumstances, the Court will treat the notes as though they were attached to the complaint as initially filed.

Not quite two months later—on May 25, 2021—Plaintiff extended a second loan to Orange Pelican, this time for $1.5 million. [Dkt. No. 1, ¶ 20]. As in April, this loan was also memorialized in a promissory note ("the May note"). [*Id.* at ¶ 21]; [Dkt. No. 31-2]. The May note bore interest at a higher annual rate, twenty percent, payable in quarterly installments on the same terms as the April note. [Dkt. No. 31-2, 1]. The May note was set to mature on May 25, 2022, on which date Orange Pelican agreed to pay back the principal in full, along with any unpaid interest. [*Id.*].

Aside from these differences, the April and May notes are materially identical. Both provide that, in the event of default, all unpaid principal and accrued interest "shall be immediately due and payable." [Dkt. No. 31-1, 1]; [Dkt. No. 31-2, 1]. Both define "Event of Default" to include, *inter alia*, (1) Orange Pelican's failure "to pay the Principal Amount within ten (10) business days of the Maturity Date"; (2) Orange Pelican's "initiat[ion] or defen[se of] any case, proceeding, or other action which seeks to have an order for relief entered, adjudicating" Orange Pelican "as bankrupt or insolvent," *i.e.*, a bankruptcy proceeding; (3) and Orange Pelican's "dissolving or liquidating." [*Id.*]. Finally, each note includes a choice-of-law provision expressing the parties' intent that it "be construed in accordance with and governed by the laws of the State of Wisconsin." [*Id.*].

According to Orange Pelican, these notes "were specifically executed for the investment purpose of purchasing and selling medical-grade imports." [Dkt. No. 33, 6]. The plan was to repay the notes with revenue generated from the domestic sale of those imports. [*Id.*]. Although details are scarce, this "investment opportunity"

4

allegedly foundered due to "unforeseeable manufacturing problems" and "possibly fraudulent business conditions" that "are the subject of a separate lawsuit . . . ." [*Id.* at 5]. These roadblocks "prevent[ed] delivery of" the sought-after "medical imports to the United States." [*Id.* at 6]. Without products to resell, Orange Pelican lacked the cash flow it thought it would have when the notes reached maturity. The pleadings do not speak to what other assets Orange Pelican might have had to repay the notes. Be that as it may, when each note matured, Orange Pelican failed to make payments on either note, let alone repay all outstanding principal and accrued interest as required by their terms. [*Id.* at ¶¶ 14, 24].

Plaintiff filed suit in this Court to recover the principal and accrued interest that remains unpaid on each note. [Dkt. No. 1]. Defendant moved to dismiss for lack of personal jurisdiction. [Dkt. No. 13]. After that motion was denied, Defendant answered the complaint and asserted three affirmative defenses. The first affirmative defense—lack of personal jurisdiction—was included solely for the sake of preservation. [Dkt. No. 33, 5]. The second and third—frustration of purpose and commercial impracticability—are both centered on the same basic theory: that the "unforeseeable manufacturing problems" and "possibly fraudulent business conditions" that prevented Orange Pelican from successfully importing medical supplies for resale discharged its obligation to repay Plaintiff under both notes. [*Id.* at 5–6].

## II.  Legal Standards

### A.  Motion to Strike Affirmative Defenses

Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike affirmative defenses are disfavored, *Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991), and will be granted only when an affirmative defense is "insufficient on the face of the pleadings." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). That being said, granting a motion to strike is appropriate where doing so will "remove unnecessary clutter from the case," which can "serve to expedite" its adjudication. *Id.*; *see also* FED. R. CIV. P. 1 (emphasizing that the Federal Rules of Civil Procedure should be "employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding").

Courts in this district have applied a three-prong test to determine whether an affirmative defense is "sufficient" on its face within the meaning of Rule 12(f). In order to survive a motion to strike, "'(1) the matter must be properly pleaded as an affirmative defense; (2) the matter must be adequately pleaded under the Requirements of Federal Rules of Civil Procedure 8 and 9; and (3) the matter must withstand a Rule 12(b)(6) challenge . . . .'" *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1039 (N.D. Ill. 2014) (quoting *Renalds v. S.R.G. Rest. Grp.*, 119 F. Supp. 2d 800, 802–03 (N.D. Ill. 2000)); *see also Connectors Realty Grp. Corp. v. State Farm Fire & Cas. Co.*, 2021 WL 1143513, at *3 (N.D. Ill. Mar. 25, 2021).

Although the Seventh Circuit has yet to expressly approve this framework, each prong follows from the basic fact that affirmative defenses are pleadings and—consequently—"subject to all pleading requirements of the Federal Rules of Civil Procedure." *Heller*, 883 F.2d at 1294.

A defense that fails to satisfy any one of these requirements is "insufficient" under Rule 12(f) and, therefore, may be stricken. Importantly, however, just as a plaintiff may seek leave to amend a deficient complaint, a defendant may seek leave to amend a stricken affirmative defense, provided it can rectify the defect identified by the court and an amendment is appropriate under Rule 15(a)(2). 6 Wright & Miller, Federal Practice and Procedure § 1475 (3d ed.). For this reason, it matters a great deal whether a motion to strike premised on the third prong—whether the affirmative defense would survive a motion to dismiss under Rule 12(b)(6)—mounts a factual or legal challenge. An affirmative defense that is *factually* deficient may be revived through amendment, assuming the Defendant can allege sufficient factual matter to survive the applicable standard of review. A successful challenge to the *legal* sufficiency of an affirmative defense, however, may conclusively remove a defense from the case, provided that that deficiency would continue to exist on any conceivable set of facts. Here, Plaintiff challenges the legal sufficiency of Defendant's affirmative defenses.

### B. Motion for Judgment on the Pleadings

Although it is often said that "[a] motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is subject to the same standard as

a Rule 12(b)(6) motion to dismiss," *United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991); *Federated Mutual*, 983 F.3d at 313 ("The only difference . . . is timing; the standard is the same."), this is true only when the party moving for judgment on the pleadings is a defendant *denying* liability. *See, e.g.*, *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (applying *Twombly* and *Iqbal*'s "plausibility" standard to claims dismissed by the district court on the pleadings).

By contrast, "'[w]hen a plaintiff moves for judgment on the pleadings'"—and thereby seeks entry of a judgment against the defendant—"'the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to supports its position, and that the plaintiff is entitled to relief.'" *Federated Mutual*, 983 F.3d at 313 (quoting *Scottsdale Insurance Company*, 972 F.3d at 919 (7th Cir. 2020)). "'Thus to succeed, the moving party must demonstrate that there are no material issues of fact to be resolved.'" *Federated Mutual*, 983 F.3d at 313 (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998)).[4]

"As the title of the rule implies, Rule 12(c) permits a judgment based on the pleadings alone." *Indiana Gun*, 163 F.3d at 452; *see also* FED. R. CIV. P. 12(d) ("If, on

---

[4]     This distinction comports with common sense. When a court grants judgment on the pleadings to a defendant, the plaintiff may always seek leave to amend his complaint. But when a plaintiff moves for judgment on the pleadings against a defendant, he seeks a conclusive determination of liability. Such a determination—especially when made on the basis of limited facts—threatens to "deprive the non-moving" defendant "of the opportunity to make its case." *Federated Mutual*, 983 F.3d at 313. Basic principles of fairness therefore dictate that courts resolve any doubt in favor of permitting the defendant to build its case through discovery. Should the defendant fail, the plaintiff may always renew his arguments in a motion for summary judgment.

a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). "The pleadings include the complaint, the answer, and any written instruments attached as exhibits." *Id.*; *see* FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). The Seventh Circuit "has interpreted the term 'written instrument' as used in Rule 10(c) to include documents," including "contracts . . . and loan documentation . . . ." *Indiana Gun*, 163 F.3d at 453.

In evaluating a motion for judgment on the pleadings, courts must "view[] all facts" contained in the pleadings and draw all reasonable "inferences in the light most favorable to the non-moving party." *Federated Mutual*, 983 F.3d at 313. However, if the nonmovant fails to contest a factual "allegation[] to which [it] had an opportunity to respond," that allegation must be "taken as true." *Wood*, 925 F.2d at 1581–82 (citing *Flora v. Home Fed. Sav. and Loan Ass'n*, 685 F.2d 209, 211 (7th Cir. 1982)).

## III. Analysis

Because the Court sits in diversity, it "applies state 'substantive' law and federal 'procedural' law." *Mathis v. Metropolitan Life Ins. Co.*, 12 F.4th 658, 661 (7th Cir. 2021) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also* 28 U.S.C. § 1652. Both the April and May notes provide for the application of Wisconsin law, and briefing by both parties proceeds on the assumption that the law of that State

applies. The Court likewise agrees that the promissory notes' choice-of-law provision is enforceable under Illinois law. [5]

Therefore, the Court will apply Wisconsin law to both Plaintiff's breach-of-contract claims and to Defendant's defenses on the merits. *See Williams*, 944 F.2d at 1400 ("In a diversity case, the legal and factual sufficiency of an affirmative defense is examined with reference to state law."). In "ascertain[ing] the substantive content" of Wisconsin law, the Court looks to the law "as it either has been determined by the highest court of the state"—the Wisconsin Supreme Court—"or as it would be by that court if the present case were before it now . . . ." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). "[I]n the absence of prevailing authority from the state's highest court, federal courts . . . give great weight to the holdings of the state's intermediate appellate courts and . . . deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court." *Id.*

Under Wisconsin law, a breach-of-contract claim requires proof of three elements: (1) "a valid contract"; (2) "breach[]" of that contract; and (3) "damages

---

[5]     This Court, sitting in diversity, is bound to apply "the choice-of-law rules of the forum state" in which it is located—here, Illinois. *Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 661 n.3 (7th Cir. 2022); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Illinois . . . recognize[s] the validity of an express choice of law provision contained in a contract," so long as (1) it does not "contravene[] Illinois public policy" and (2) there is "some relationship between the chosen forum and the parties or the transaction." *Hartford v. Burns Int'l Sec. Servs., Inc.*, 171 Ill. App. 3d 184, 187, 526 N.E.2d 463, 464 (Ill. App. Ct. 1988); *see also Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 351, 770 N.E.2d 177, 194 (Ill. 2002). Neither party has asserted—and the Court has no reason to think—that the choice-of-law provision in the April and May notes violates Illinois public policy. There is a strong relationship between Wisconsin and the parties that adequately justifies giving effect to the parties' agreement to be bound by the law of that State. *See Sun Life Assurance Co. of Canada v. Great Lakes Bus. Credit LLC*, 968 F. Supp. 2d 898, 910 (N.D. Ill. 2013).

10

flowing from that breach." *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Nw. Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296, 187 N.W.2d 200, 203 (Wis. 1971)). Orange Pelican does not dispute that the April and May notes are valid contracts. *See* [Dkt. No. 33, ¶¶ 10–12, 20–22]; [Dkt. No. 38, at 6] ("[T]he contract was made under the assumption that the investment would provide returns that allowed Orange Pelican to repay Romans and make some profit.").

Defendant also does not dispute that it failed to repay the principal and accrued interest due under each note on their respective maturity dates. [Dkt. No. 33, at ¶¶ 14, 24]. And although Orange Pelican denies the specific amount Plaintiff claims in damages—$2,122,500 for the April note and $1,647,500 for the May note— it does so only because it "lacks knowledge or information sufficient to form a belief about the truth" of those amounts. [Dkt. No. 1, ¶¶ 17, 27]; [Dkt. No. 33, ¶¶ 17, 27]. Nowhere does Defendant argue (nor could it) that Plaintiff has not suffered pecuniary damages in an amount sufficient to establish the third element of each of Plaintiff's breach-of-contract claims.

Therefore, Defendant's answer all but concedes that unless Defendant can prove one of its three affirmative defenses, judgment should be entered in favor of Plaintiff. But even if the Court were to grant Plaintiff's motion to strike as to each and every defense, judgment on the pleadings would not necessarily follow. As the Court discussed above, a defendant may move to amend an answer to cure a defectively-pleaded affirmative defense. Whether judgment on the pleadings is warranted in this case therefore turns not on whether the Court grants Plaintiff's

11

motion to strike, but *why* Defendant's defenses are stricken and *whether* there is a conceivable fix.

Plaintiff appears to recognize this, arguing that because Defendant has conceded Plaintiff's *prima facie* case, and because each of Defendant's affirmative defenses is fatally "deficient as a matter of law," judgment on the pleadings should logically follow. [Dkt. No. 34, 7]. The Court agrees that were all of Defendant's affirmative defenses indisputably and irredeemably defective under Wisconsin law, judgment on the pleadings as to liability on both counts would be appropriate, followed by subsequent proceedings to determine damages.

To make this necessary showing, Plaintiff bears the burden of proving that discovery would be a futile and wasteful exercise—that it is not unfair to deprive Defendant of the *chance* to mount a defense, because it is simply beyond question that there is no defense to mount. *See Federated Mutual*, 983 F.3d at 313 ("District courts should not allow motions for judgment on the pleadings to deprive the non-moving party of the opportunity to make its case."); 5C Wright & Miller, Federal Practice and Procedure § 1368 (3d ed.) (warning that "hasty or imprudent" granting of a motion for judgment on the pleadings "violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense").

With this understanding of Plaintiff's task in view, the Court will now examine each of Defendant's affirmative defenses and explain why Plaintiff has failed—though only narrowly—to demonstrate the futility of Defendant's overall defense.

A.     **Motion to Strike**

Defendant asserts three affirmative defenses—lack of personal jurisdiction, commercial impracticability, and frustration of purpose. The parties have briefed a fourth defense—impossibility—and the Court will evaluate that defense as well.

1.  *Personal Jurisdiction*

On September 2, 2022, Defendant moved to dismiss Plaintiff's complaint for lack of personal jurisdiction. [Dkt. No. 13]. On November 10, 2022, the Court found that it could exercise specific personal jurisdiction over Defendant and denied the motion. [Dkt. No. 22]. Notwithstanding that decision, Defendant's answer asserts lack of personal jurisdiction as an affirmative defense. [Dkt. No. 33, 5]. Defendant explains that it does so only "for preservation purposes." [*Id.* at 5 n.1]. Plaintiff requests that the Court strike the defense as "legally deficient." [Dkt. No. 34, 7]. Defendant's brief neither responds to Plaintiff's argument nor explains why inclusion of its personal jurisdiction defense in the answer is necessary to preserve the argument for appeal.

Under Federal Rule of Civil Procedure 12(h)(1), "a defendant does not waive, and therefore necessarily preserves, its personal-jurisdiction defense by either raising it in a Rule 12(b)(2) motion *or* including it in a timely-filed responsive pleading." *Mold-A-Rama Inc. v. Collector-Concierge-Int'l*, 451 F. Supp. 3d 881, 885 (N.D. Ill. 2020). In contesting personal jurisdiction in a motion to dismiss, Defendant did everything necessary to preserve the issue for appeal. Therefore, the inclusion of that defense in Defendant's answer serves no purpose. For that reason, the Court

grants Plaintiff's motion to strike this defense, but it stresses that doing so in no way diminishes Defendant's right to seek appellate review of the ruling on jurisdiction.

## 2. *Commercial Impracticability*

On the merits, Defendant invokes the doctrine of commercial impracticability. This defense traces its origins to § 2-615 of Article 2 the Uniform Commercial Code ("the UCC"), which excuses breach by a seller of goods "if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance with any applicable foreign or governmental regulation or order . . . ." U.C.C. § 2-615 (AM. LAW INST. & UNIF. LAW COMM'N 1957). Wisconsin, like most states, has enacted the UCC, including § 2-615, into law. *See generally* WIS. STAT. chs. 402–11; § 402.615.

Defendant argues that unspecified "manufacturing issues . . . prevent[ed] delivery of" the "medical imports" it intended to sell to repay the April and May notes, thus rendering performance of the notes "commercially impracticable." [Dkt. No. 33, 6]. In making this argument, Defendant likens its difficulty paying what it owes under the promissory notes—brought about by its failure to acquire (rather than sell) goods using the proceeds of Plaintiff's loans—to the difficulty a seller of goods might experience delivering goods to a buyer due to an unforeseen contingency. [*Id.*]; [Dkt. No. 38, 4–5].

As Plaintiff correctly observes, however, § 402.615—like § 2-615 of the UCC— applies only to transactions in "goods." *See* WIS. STAT. § 402.102 ("Unless the context otherwise requires, this chapter applies to transactions in goods . . . ."); *see also*

*Marquette Univ. v. Kauli, Inc.*, 584 F. Supp. 3d 720, 723–24 (E.D. Wis. 2022). Section 402.105(c), in turn, defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (ch. 408) and things in action."

Try as Defendant might to analogize its financial distress to that of a seller of goods, a promissory note is not a sale of goods—it is "[a] written promise by one party (the maker) to pay money to another party (the payee)" or to the "bearer" of the instrument. *Note*, BLACK'S LAW DICTIONARY (Bryan A. Garner ed., 11th ed. 2019). The promissory notes in this case were executed by Defendant for the benefit of Plaintiff in consideration of Plaintiff's loaning Defendant $3.5 million. That Defendant intended to *use* these funds to import goods does not transform a promise to pay money into a transaction in goods. Therefore, this case does not fall within the scope of chapter 402 of the Wisconsin Statutes, a prerequisite to the applicability of § 402.615.

Undeterred, Defendant attempts to salvage this defense by vaguely implying that commercial impracticability has roots in "underlying equitable and common law principles" that this Court can apply outside of the express limitations the Wisconsin legislature placed on § 402.615's scope. [Dkt. No. 38, 5]. The Court has searched in vain for *any* decision—by a Wisconsin court or by a federal court applying Wisconsin law—extending the defense of commercial impracticability beyond its statutory moorings. Because the Court has no compelling reason to think the Wisconsin

15

Supreme Court would do so were it to consider this case, the Court holds that the defense of commercial impracticability is inapplicable to the April and May notes as a matter of law. Consequently, the Court grants Plaintiff's motion to strike this defense.

### 3. *Frustration of Purpose*

Defendant's last remaining defense—frustration of purpose—is a creature of the common law. Unlike commercial impracticability, which looks to the effect of unforeseen contingencies on the burden of performing a contract obligation, the frustration of purpose doctrine looks to the effect of such contingencies on the parties' *reasons* for entering into an agreement in the first place. Where an unforeseen contingency substantially frustrates the "'principal purpose of [a] party'" in entering into a contract, it may justify non-performance by that party. *Convenience Store Leasing and Mgmt. v. Annapurna Marketing*, 2019 WI App 40, ¶ 16, 388 Wis. 2d 353, 363, 933 N.W.2d 110, 115 (Wis. Ct. App. 2019).

The doctrine is best illustrated with an example. In *Krell v. Henry*, "[o]ne of the earliest cases of frustration of purpose," *Chi., Milwaukee, St. Paul & Pac. R.R. Co. v. Nw. Transp. Co.*, 82 Wis. 2d 514, 522, 263 N.W.2d 189, 193 (Wis. 1978), the defendant leased an apartment with a window overlooking the route of King Edward VII's coronation parade. [1903] 2 K.B. 740, 740–41 (AC). The lease agreement was consummated through the exchange of two letters, neither of which "mention[ed] the coronation." *Id.* at 741. Indeed, the letters "sp[oke] merely of" defendant's agreement to lease—at the price of 75 pounds—plaintiff's apartment during "the daytime" hours

16

of June 26 and June 27, 1902. *Id.* at 749. After the contract was executed, the King took ill, and the coronation parade was cancelled. *Id.* at 740. Because defendant no longer had any reason for using the apartment, he refused to honor the lease. The tenant sued and the trial judge found for the defendant. *Id.* at 740, 742.

In affirming that decision, the Court of Appeal found that the defendant's facially unambiguous agreement to lease the apartment was qualified by an implied understanding that the defendant's sole purpose in leasing the apartment was to watch the coronation parade. *Id.* at 751–52. It reasoned that it was not "in the contemplation of the contracting parties, when the contract was made, that the coronation would not be held on the proclaimed days," and, consequently, held that the express "words imposing on the defendant the obligation to accept and pay for the use of the rooms for the named days, although general and unconditional, were not used with reference to the possibility of the particular contingency which afterwards occurred." *Id.* at 750. The defendant's duty to perform his end of the bargain was, accordingly, discharged.

Since *Krell*, the frustration of purpose doctrine has become firmly rooted in American common law tradition. In 1978, the Wisconsin Supreme Court formally adopted the doctrine, as articulated by a tentative draft of Section 265 of the Second Restatement of Contracts. *Wm. Beaudoin & Sons, Inc. v. Milwaukee Cty.*, 63 Wis. 2d 441, 448, 217 N.W.2d 373, 377 (Wis. 1974); *see also Pacific Railroad*, 82 Wis. 2d at 521–22, 263 N.W. 2d at 193. That draft provided that

> Where, after a contract is made, a party's principal purpose is
> substantially frustrated without his fault by the occurrence of an event

17

the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

*Beaudoin & Sons*, 63 Wis. 2d at 448, 263 N.W.2d at 377. So framed, the doctrine has three elements: that (1) "the party's principal purpose in making the contract is frustrated; (2) without that party's fault; (3) by the occurrence of an event, the non-occurrence was a basic assumption on which the contract was made."[6] *In re Estate of Sheppard*, 2010 WI App 105, ¶ 13, 328 Wis. 2d 533, 540–41, 789 N.W.2d 616, 619–20 (Wis. Ct. App. 2010). As to the third prong, the non-occurrence of the frustrating event "'must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense.'" *Annapurna Marketing*, 2019 WI App 40, ¶ 16, 388 Wis. 2d at 363, 933 N.W.2d at 115 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a (AM. LAW INST. 1981)).

"Proving frustration of purpose is generally a tall order." *Annapurna Marketing*, 388 Wis. 2d at 363, 933 N.W.2d at 115. The defense "is 'given a narrow construction' and 'applied sparingly,'" as it "renders null the explicit terms of the contract and is counter to the strong impulse in law to enforce contracts as written." *Id.*, 388 Wis. 2d at 362–63, 933 N.W.2d at 115 (quoting 17A AM. JUR 2D CONTRACTS § 641 (2016)). Only a "frustrating event [that] strike[s] at the foundation of [a] contract" will justify relieving a promisor of the contractual obligations it voluntarily undertook to perform. *Id.*, 388 Wis. 2d at 364, 933 N.W.2d at 115. In conducting this inquiry, an important consideration is whether the frustrating event was foreseeable to the

---

[6] "Party," here, refers to the party invoking the doctrine.

parties, such that provision could have been made for it within the four corners of the contract, though foreseeability is not dispositive. *Pacific Railroad*, 82 Wis. 2d at 526, 263 N.W.2d at 195.

Defendant argues that its principal purpose in entering into the promissory notes in this case was to "further[] . . . a specific investment in medical grade imports." [Dkt. No. 33, 5]. Defendant alleges that this purpose was frustrated by "unforeseeable manufacturing problems" that "entirely prevented [the] investment opportunity from taking fruit" and argues that this supervening event discharged its duty to repay the notes. [*Id.*]. The pleadings do not provide much information about the manufacturing problems that allegedly thwarted Defendant's commercial objectives, explaining— though only vaguely—that they arose from "possibly fraudulent" behavior for which Defendant bears no responsibility.[7] [*Id.*].

Plaintiff seeks to strike this defense on three grounds. First, he argues that because the promissory notes "are unambiguous on their face," Defendant may not rely on extrinsic evidence to prove its primary purpose. [Dkt. No. 34, 7]; [Dkt. No. 39, 1] ("Orange Pelican cannot rely on its defense of frustration because its alleged inability to procure medical grade imports is not the subject of or a condition precedent to payment under the promissory notes, which are admittedly

---

[7]    Defendant's opposition brief provides more detail but relies on information outside the pleadings that the Court may not consider at this stage of the litigation. *See* [Dkt. No. 38, 2– 4]. Plaintiff attempts to use this information to its advantage in reply. [Dkt. No. 39, 2–4]. However, because the Court may not consider the information in the first place, it may not consider these arguments either.

unambiguous."); [*Id.* at 2] ("[T]he language of the contract exclusively demonstrates the parties' intent.").

In Plaintiff's view, the only purpose fairly discernable from the four corners of the notes is an intent to borrow money. Because *that* purpose could not have been frustrated by events occurring after Plaintiff performed his end of the bargain, Plaintiff argues that Defendant's theory of frustration must fail as a matter of law. [Dkt. No. 34, 8–9] (citing *Bank of Boston Int'l of Miami v. Arguello Tefel*, 644 F. Supp. 1423, 1426–27 (E.D.N.Y. 1986) ("[D]efendants' purpose in entering into this transaction with plaintiff was to borrow money. The purpose was fulfilled when defendants received the loan proceeds from the plaintiff and is unaffected by subsequent events.")).

Second—and relatedly—Plaintiff argues that even if Defendant's primary purpose was to acquire and resell medical grade imports, Defendant "cannot show that the non-occurrence of the supposed frustrating event was a basic assumption underlying the notes." [*Id.* at 7]. Finally, Plaintiff argues that the frustration here, if any, is not substantial enough to relieve Defendant of its contractual obligations under the notes. [*Id.* at 9]; [Dkt. No. 39, 3].

The premise of Plaintiff's first argument—that extrinsic evidence may not aid in the discernment of a party's principal purpose—presents an issue that the Wisconsin Supreme Court has never squarely addressed. To be sure, in Wisconsin—like most states—extrinsic evidence may not be used to interpret an unambiguous contract, *see, e.g.*, *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, 196–97, 716

N.W.2d 807, 820 (Wis. 2006); *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 356, 793 N.W.2d 476, 484 (Wis. 2010), but as the Eighth Circuit recognized in *Pieper, Inc. v. Land O'Lakes Farmland Feed, LLC*, the inquiry does not end there. 390 F.3d 1062 (2004).

In that case, the Eighth Circuit—reviewing a district court's application of the frustration of purpose doctrine under Minnesota law—faced precisely the question before this Court. 390 F.3d 1062 (2004). The "Minnesota courts" had, at least at that point, never "directly addressed the question of whether a court may rely on extrinsic evidence to determine a party's principal purpose." 390 F.3d at 1065. In Minnesota at that time—as in Wisconsin today—courts could not draw on extrinsic evidence to interpret an unambiguous contract. *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 392 n.1 (Minn. 1998). Nevertheless, the Eighth Circuit held that were the Minnesota Supreme Court to consider the question, it *would* allow courts to consider extrinsic evidence to discern a party's principal purpose in entering into even an unambiguous contract. *Pieper*, 390 F.3d at 1066.

The Eighth Circuit's reasoning was two-fold. First, it pointed to the opinion of an intermediate appellate court, which made express use of extrinsic evidence to ascertain a party's principal purpose. *Id.* at 1065–66. And second, it emphasized the English Court of Appeal's use of extrinsic evidence in *Krell v. Henry*, "the landmark case on frustration of purpose." 390 F.3d at 1066. In light of this evidence of state court practice and common law tradition, the *Pieper* Court held that the district court

below "did not err in considering extrinsic evidence" to determine a party's principal purpose in entering the contract at issue. *Id.*

The Court finds *Pieper* persuasive and directly on point. Although Wisconsin courts have never considered the propriety of using extrinsic evidence for purposes of applying the frustration of purpose doctrine, the Wisconsin Supreme Court used extrinsic evidence to discern the defendant's principal purpose in *Chicago, Milwaukee, St. Paul & Pacific Railroad Company v. Northwest Transportation Company*, arguably that Court's most comprehensive treatment of the on frustration of purpose doctrine to date. 63 Wis. 2d 441, 217 N.W.2d 373 (Wis. 1974).

In that case, one railroad company sued another railroad company to recover for breach of a depot agreement under which the defendant railroad promised to pay—for "a term of ten years"—to jointly use the plaintiff railroad's "Milwaukee depot and 11.1 miles of track in the City of Milwaukee." *Id.*, Wis. 2d at 524, 263 N.W. 2d at 194. The defendant railroad needed the facilities to discharge certain obligations to provide intercity passenger service. *Id.* In 1970, however, Congress created Amtrak and nationalized intercity passenger rail. *Id.*. 82 Wis. 2d at 519, 263 N.W.2d at 191. When Amtrak took over the defendant railroad's passenger service, the defendant railroad walked away from the depot agreement and the plaintiff railroad sued. *Id.*, 82 Wis. 2d at 518–19, 263 N.W.2d at 191.

The defendant railroad asserted frustration of purpose as a defense to liability. This required the trial judge below, and the Wisconsin Supreme Court on appeal, to ascertain the defendant railroad's principal purpose in entering into the depot

agreement. The Wisconsin Supreme Court ultimately found that its purpose "was to operate required intercity rail passenger service in the Milwaukee area in the most efficient manner." *Id.*, 82 Wis. 2d at 524, 263 N.W.2d at 194.

In arriving at this conclusion, the Wisconsin Supreme Court considered a wide variety of extrinsic evidence, including, *inter alia*, (1) evidence of the defendant railroad's efforts to downsize its passenger rail operations prior to entering into the depot agreement; (2) evidence showing that the defendant railroad had operated its passenger rail service at a loss in the years before entering into the depot agreement; and (3) the testimony of the defendant railroad's executives that the company did not foresee the creation of Amtrak or the nationalization of intercity passenger rail. *Id.*, 82 Wis. 2d at 516–518, 263 N.W.2d at 190–91. The Court considered that evidence without first discussing whether the depot agreement was ambiguous, suggesting that it did not understand ambiguity to be a prerequisite to the consideration of extrinsic evidence in this context.

This is strong evidence that were the Wisconsin Supreme Court to consider the question today, it would expressly permit lower courts to consider extrinsic evidence in ascertaining the principal purpose of a party invoking frustration. This conclusion is further bolstered by the approval Wisconsin courts have expressed for the holding in *Krell v. Henry*. *See, e.g.*, *Pacific Railroad*, 390 F.3d at 523–24; *Annapurna Marketing*, 2019 WI App 40, ¶ 22, 388 Wis. 2d at 367–68, 933 N.W.2d at 117.

In that foundational case, the English Court of Appeal not only used extrinsic evidence, it expressly rejected the argument that extrinsic evidence could not be used

to prove frustration. [1903] 2 K.B. 740, 748–49 (AC). As the Court discussed above, the lease agreement in that case did not once mention the defendant's plan to use the leased apartment to watch the King's coronation parade. The Court's holding in *Krell* was possible only *after* consideration of extrinsic information—namely, that the plaintiff's agent posted an announcement in the windows of the leased apartment that held it out as an ideal place to watch the coronation parade. *Id.* at 741.

In affirming the district court, the Court of Appeal held that in determining the "substance of [a] contract," courts applying the frustration defense *could* consider "inferences . . . drawn from surrounding circumstances recognized by both contracting parties." *Id.* at 749. Where that substance "needs for its foundation the assumption of the existence of a particular state of things," the existence of this thing—whatever it may be—"limit[s] the operation of the general words" of the contract . . . ." *Id.* So even where a contract is facially unambiguous and even where the frustrated party's purpose in entering into that contract is not apparent from the words of the contract itself, surrounding circumstances may operate as an implied limitation on the contract's unambiguous terms.

In light of both the Wisconsin Supreme Court's own practice and the holding in *Krell*—a case Wisconsin courts reference approvingly—the Court is not persuaded by Plaintiff's argument that Defendant may not prove a principal purpose that is not apparent from the terms of the promissory notes themselves. The Court emphasizes, however, that the words of the promissory notes remain strong evidence of the intent of the parties, and nothing about the Court's holding on this issue changes the

fundamental reality that frustration of purpose is a doctrine applied only sparingly. *Annapurna Marketing*, 388 Wis. 2d at 362–63, 933 N.W.2d at 115 (quoting 17A AM. JUR 2D CONTRACTS § 641 (2016)).

This conclusion all but disposes of Plaintiff's first two arguments—that the Court should strike Defendant's frustration defense because (1) the sole purpose discernable from the promissory notes themselves is that Defendant intended to secure financing, a purpose which necessarily cannot be frustrated by events occurring after that financing is provided; and because (2) the "absence of impediments [to] obtaining the 'medical grade imports'" was not "a fundamental assumption of both parties." [Dkt. No. 34, 8].

As to the first, because the Court holds that it can consider extrinsic evidence, the Court is not limited to the four corners of the promissory notes. It is, therefore, not a foregone conclusion that Defendant's primary purpose will be as Plaintiff describes. As to the second, it is simply premature to decide—as a matter of law— what each party assumed about the contract, given that more than just the promissory notes bears on that question. To put a finer point on things, because Defendant can bring extrinsic evidence to bear on each of these questions, material issues of fact remain that preclude the Court from finding Defendant's frustration defense—on the skeletal record before it—deficient as a matter of law.

As to Plaintiff's final argument—that "Orange Pelican's supposed inability to invest in 'medical grade imports' was not a frustrating event so central to the Notes that [its] inability to obtain" those imports justifies non-performance, [Dkt. No. 34, at

9]—the Court lacks crucial information necessary to determine the degree of any frustration here.

Assuming *arguendo* that Defendant could prove that its principal purpose in entering into the promissory notes was to successfully import medical goods, rather than simply to secure financing, the degree of frustration would depend on a number of facts not currently before the Court. For instance, the nature of the "possibly fraudulent business conditions" alluded to by Defendant in its answer would certainly be important. As would the extent to which those conditions prevented Defendant from importing goods, the disposition of the proceeds of the promissory notes, and what role, if any, Defendant had in choosing and vetting the third-party supplier that allegedly created problems for it. Without this information, the Court is not satisfied to the requisite level of certainty that Defendant's defense will be deficient as a matter of law no matter what discovery uncovers.

In light of this conclusion, it would be inappropriate to deprive Defendant of at least the *opportunity* to make its defense, and the Court will not do so. The Court emphasizes, however, that Plaintiff's position in this case appears to be a strong one. By all appearances, the notes were simply investments by Plaintiff into a speculative venture—not a joint undertaking by virtue of which both parties intended to equally shoulder the risk of failure. In including Defendant's insolvency as a condition of default, and in charging high rates of interest, the terms of the notes suggest that the Plaintiff understood that Defendant might falter and lent the funds subject only to

the risk that he might fail to recover should Defendant become insolvent. Defendant has a steep hill to climb to overcome this evidence.

### 4. *Impossibility*

Although Defendant does not assert an impossibility defense in its answer, the parties have briefed the issue at length. [Dkt. No. 34, 10–11]; [Dkt. No. 38, 5–6]; [Dkt. No. 39, 6–8]. Because Defendant might move to amend its answer under Rule 15(a)(2) to assert such a defense, the Court will explain why that defense would fail as a matter of law.

"Impossibility is a common law contract doctrine that excuses what would otherwise be a breach of contract under very limited and narrowly defined circumstances." 30 Williston on Contracts § 77:1 (4th ed. 2022). Unlike the defenses of commercial impracticability or frustration of purpose—which, under appropriate circumstances, can discharge an obligor of a contractual duty within his power to perform—impossibility applies only when "the thing to be done cannot by *any* means be accomplished . . . ." *Id.*

In *In re Zellmer's Estate*, the Wisconsin Supreme Court adopted sections 455 and 456 of the first Restatement of Contracts, which articulate this traditional standard. 1 Wis. 2d at 49, 82 N.W.2d at 893. Section 456 provides that

> [e]xcept as stated in Section 455, or where a contrary intention is manifested, a promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promisor neither knows nor has reason to know.

The first Restatement uses "impossible" in the literal sense of the word. As Section 455 makes clear,

[i]mpossibility of performing a promise that is not due to the nature of the performance, but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract.

Both the Restatement and the Wisconsin Supreme Court thus distinguish between "objective" impossibility—performance that cannot be rendered as a general matter—and "subjective" impossibility—performance that cannot be rendered due to the individual circumstances of the obligor. *Zellmer's Estate*, 1 Wis. 2d at 49, 82 N.W.2d at 893; *Scherrer Const. Co. v. Burlington Mem'l Hosp.*, 64 Wis. 2d 720, 733–34, 221 N.W.2d 855, 862 (Wis. 1974). If performance is merely subjectively impossible, that fact does not discharge an obligor from his duty to perform.

Under these principles, any claim of impossibility in this case would fail. Defendant does not argue—nor could it—that payment of the notes is objectively impossible. Payment is always possible, at least where the agreed-upon consideration exists. It's not even clear that payment in this case is subjectively impossible. Defendant has nowhere argued that it lacks the ability to pay—it just seeks to avoid its obligation to do so. But even if Defendant is insolvent, its inability to repay would arise not from the nature of performance, but from its individual financial condition. Under Wisconsin law, such difficulty cannot discharge Defendant of its contractual obligations. *Cf.* 30 Williston on Contracts § 77:40 (4th ed. 2022) ("As a general rule . . . , [w]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused.").

**B.    Motion for Judgment on the Pleadings**

In light of the Court's conclusion that Defendant should be given at least the opportunity to conduct discovery on its frustration of purpose defense, the Court denies Plaintiff's motion for judgment on the pleadings. Because there is at least some possibility, however slim, that Defendant could establish that defense, its liability to Plaintiff is not quite "beyond doubt." *Federated Mutual*, 983 F.3d at 313.

**IV.    Conclusion**

For the reasons expressed above, Plaintiff's Motion is granted in part and denied in part. [Dkt. 34]. The Court grants Plaintiff's motion to strike Defendant's personal jurisdiction and commercial impracticability defenses. To the extent Defendant intends to rely on common law impossibility, that defense also fails. The Court denies Plaintiff's motion to strike Defendant's frustration of purpose defense. For that reason, it also denies Plaintiff's motion for judgment on the pleadings. This case will proceed to discovery on Defendant's sole remaining frustration of purpose defense. The parties are to file a joint status report by or before April 27, 2023 proposing a fact discovery schedule. The Court strikes the May 11, 2023 status hearing, and the initial status report date set by Dkt. 45.

Enter: 22-4169

Date April 13, 2023

_____
Lindsay C. Jenkins
United States District Judge